IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| AMEGY BANK NATIONAL ASSOCIATION fka SOUTHWEST BANK OF TEXAS,<br><br>   Plaintiff<br><br> vs.<br><br>MISS CONY, Cayman Island O.N. 733932, her engines, tackle, gear and appurtenances, In Rem; IMIC HOLDINGS, INC., In Personam; and RICHARD R. FOREMAN, In Personam,<br><br>   Defendants. | CIVIL NO. 06-00405 SOM/KSC<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY ACTION; ORDER DENYING AMEGY BANK NATIONAL ASSOCIATION'S MOTION FOR INTERLOCUTORY SALE |

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY ACTION; ORDER DENYING AMEGY BANK NATIONAL ASSOCIATION'S MOTION FOR INTERLOCUTORY SALE

I.  INTRODUCTION.

On July 27, 2006, Plaintiff Amegy Bank National Association fka Southwest Bank of Texas, N.A. ("Amegy"), filed a Verified Complaint ("Complaint") against Defendant Miss Cony, Cayman Islands O.N. 733932, her engines, tackle, gear, and appurtenances ("Miss Cony" or "the vessel") in rem, and against Defendants IMIC Holdings, Inc. ("IMIC") and Richard R. Foreman ("Foreman") in personam.[1]  Amegy alleges that IMIC executed two promissory notes in favor of Amegy in the amount of $200,000 each and that Foreman personally guaranteed both notes.  IMIC executed

---

[1] IMIC and Foreman are referred to collectively as "Defendants."

a preferred ship mortgage on the vessel in the amount of $400,000 in favor of Amegy as security for the two promissory notes. Alleging that IMIC defaulted by not fulfilling its payment obligations under the promissory notes, Amegy seeks to foreclose on the mortgage and to recover any deficiency, interest, attorneys' fees, and costs from Defendants, jointly and severally.

On September 11, 2006, Plaintiff-Intervenor Earl Keene ("Keene") filed the Verified Complaint in Intervention ("Intervenor Complaint") against Defendants. Keene alleges that Foreman hired Keene to serve as captain of the Miss Cony and promised to pay Keene for his services and expenses. Keene says that Foreman initially paid him but has not paid him since July 2005. Keene prays for a declaration that his "maritime lien for unpaid seamens' wages" and his "maritime lien for necessaries" are valid and enforceable and seeks the condemnation and sale of the vessel. Keene seeks to recover the amount he is owed, plus interest and attorneys' fees and costs, from Defendants, jointly and severally.

Before the court are two motions: (1) Defendants' September 1, 2006, motion to compel arbitration and stay action; and (2) Amegy's September 1, 2006, motion for interlocutory sale of the vessel. Keene joins in Amegy's motion.

2

In Defendants' motion to compel, they argue that Amegy's *in personam* and *in rem* claims must be arbitrated pursuant to the terms of the promissory notes and their amendments. Defendants argue that Keene's *in rem* action against the vessel must be stayed pending the arbitration because "it is necessarily intertwined with [Amegy's] action."

Amegy's position is that arbitration is not necessary and, alternatively, that its *in rem* action should not be arbitrated or stayed. Amegy moves for an interlocutory sale, arguing that the immediate sale of the vessel via an auction conducted by the United States Marshal is appropriate because the vessel "is subject to deterioration and decay, the cost of keeping the Vessel under arrest is excessive and/or disproportionate and there has been an unreasonable delay in securing the release of the Vessel."

Keene argues that, as he was not a party to the arbitration agreement, his claims should not be arbitrated or stayed.

The court compels arbitration of the *in personam* claims asserted against Defendants by Amegy, denies Amegy's motion to authorize an interlocutory sale of the vessel, stays any court action on Amegy's claims, and declines to stay Keene's claims.

II.     LEGAL STANDARD.

The arbitration agreement at issue states, "The Federal Arbitration Act [('FAA' or 'the Act')] shall apply to the construction, interpretation, and enforcement of this arbitration provision." Exs. E-F (attached to Complaint) ("Exs. E-F") at 2. The FAA provides that any arbitration agreement within its scope "shall be valid, irrevocable, and enforceable," 9 U.S.C. § 2, and permits a party "aggrieved by the alleged refusal of another to arbitrate" to petition a district court for an order compelling arbitration in the manner provided for in the agreement. 9 U.S.C. § 4. The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts <u>shall</u> direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." <u>Chiron Corp. v. Ortho Diagnostic Sys., Inc.</u>, 207 F.3d 1126, 1130 (9th Cir. 2000) (emphasis in original). "The court's role under the Act is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." <u>Id.</u>; <u>see also</u> <u>Lifescan, Inc. v. Premier Diabetic Servs., Inc.</u>, 363 F.3d 1010, 1012 (9th Cir. 2004). "If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." <u>Chiron Corp.</u>, 207 F.3d at 1130.

4

A court must, on application of one of the parties, stay the trial of an action if any issue involved in the suit is referable to arbitration. See 9 U.S.C. § 3. That requirement, however, applies only to "the suit" insofar as it involves arbitrable issues. A court's decision to stay nonarbitrable issues or litigation among nonarbitrating parties pending the outcome of the arbitration is "left to the district court . . . as a matter of its discretion to control its docket." See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 21 n.23 (1983); see also Roderick v. Mazzetti & Assocs., Inc., 2004 WL 2554453, at *12 (N.D. Cal. 2004) ("a stay on non-arbitrable claims raised here is a discretionary decision for this court").

III.     BACKGROUND.

   A.     Amegy's Allegations.

On August 10, 2002, IMIC executed a promissory note in favor of Amegy for the principal amount of $200,000. Complaint ¶ 6. The promissory note was personally guaranteed by Foreman, the president of IMIC, who executed a guaranty agreement on that same day. Complaint ¶ 6. On August 22, 2002, IMIC executed a second promissory note in favor of Amegy for the principal amount of $200,000. Complaint ¶ 7. Foreman also personally guaranteed the second promissory note (collectively, "Promissory Notes" or "Notes") by executing a second guaranty agreement on that date. Complaint ¶ 7. On September 2, 2002, IMIC entered into a

preferred ship mortgage ("Mortgage") on Miss Cony, a 45' pleasure vessel registered in the Cayman Islands, in the amount of $400,000. Complaint ¶¶ 3, 9. The Mortgage was executed in favor of Amegy as security for the Promissory Notes. Complaint ¶ 9.

Several of the terms in the Promissory Notes were amended by agreements signed by Foreman on August 10, 2003, and July 25, 2004 (collectively, "Change Agreements"). Although the Change Agreements vary in some respects, both contain an arbitration clause ("arbitration agreement") that states:

> Borrower and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from the agreement or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Collateral shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral, including any claim to rescind, reform, or otherwise modify an agreement relating to the Collateral, shall also be arbitrated, provided however that no arbitrator shall

>     have the right or the power to enjoin or
>     restrain any act of any party.  Judgment upon
>     any award rendered by any arbitrator may be
>     entered in any court having jurisdiction.
>     Nothing in this agreement shall preclude any
>     party from seeking equitable relief from a
>     court of competent jurisdiction.  The statute
>     of limitation, estoppel, waiver, laches, and
>     similar doctrines which would otherwise be
>     applicable in an action brought by a party
>     shall be applicable in any arbitration
>     proceeding, and the commencement of any
>     arbitration proceeding shall be deemed the
>     commencement of an action for these purposes.
>     The Federal Arbitration Act shall apply to
>     the construction, interpretation, and
>     enforcement of this arbitration provision.

Exs. E-F at 2.

       According to Amegy, IMIC is in default of its payment obligations under the Promissory Notes, as it has not paid principal or interest on the Notes since April 25, 2006. Complaint ¶ 11.  Under the terms of the Notes, Amegy says the entire unpaid principal with interest is currently due and payable.  Complaint ¶ 11.

       On July 27, 2006, Amegy filed the present action against Defendants, claiming that:  (1) Amegy has a valid and enforceable preferred mortgage lien against the vessel in the amount of $304,711.97 plus interest; (2) Amegy is entitled to foreclose on the Mortgage and enforce its preferred mortgage lien; and (3) Foreman is individually liable for IMIC's default. Complaint ¶¶ 12-16.

On July 27, 2006, Amegy applied for a warrant to arrest Miss Cony. After the warrant was issued, the vessel was placed under arrest by the United States Marshal on July 28, 2006. The vessel remains under arrest at its berth at Ko Olina Marina and is in the control of the substitute custodian appointed by the court.

  B. <u>Keene's Allegations.</u>

According to the Intervenor Complaint, in June 2002, Foreman hired Keene to serve as the captain of Miss Cony. Intervenor Complaint ¶ 7. Keene says Foreman agreed to pay Keene $250 for each day Keene worked on or stayed with the vessel. Intervenor Complaint ¶ 7. Keene says Foreman also agreed to reimburse Keene for "all meals, travel expenditures, rental car expenses, and maintenance and cure claims, and all other expenses incurred by Keene as the captain of MISS CONY." Intervenor Complaint ¶ 7. Keene alleges Foreman further agreed to pay Keene "two months of severance wages when his employment concluded." Intervenor Complaint ¶ 7.

From the time Keene was hired until July 4, 2005, Foreman paid Keene's daily wages and other expenses as promised. Intervenor Complaint ¶ 11. During that time, with Keene as captain, the vessel traveled to Florida, Texas, Vancouver, and Hawaii. Intervenor Complaint ¶¶ 8-10. Keene alleges that, after July 4, 2005, Foreman refused to pay Keene's wages, to pay

8

severance wages, to reimburse Keene for amounts Keene had advanced for living and travel expenses and other necessaries, or to pay the balance on the joint credit card.  Intervenor Complaint ¶ 13.

In late August or early September 2005, pursuant to Foreman's request, Keene moved the vessel from Kailua-Kona to the Ko Olina Marina.  Intervenor Complaint ¶ 14.  Keene says Foreman "also instructed Keene to find a buyer for MISS CONY and promised Keene a broker's fee of ten percent of the sales price as a broker's commission."  Intervenor Complaint ¶ 14.  Keene unsuccessfully attempted to sell the vessel until he learned that Foreman had also hired a broker in Kailua-Kona to sell Miss Cony.  Intervenor Complaint ¶ 14.  Keene continued to live on the vessel at the Ko Olina Marina until October 2005, at which time Keene says "it became apparent that Foreman was not going to pay Keene his wages, severance, and advances for necessaries."  Intervenor Complaint ¶ 14.

On September 11, 2006, Keene filed the Intervenor Complaint, claiming that he has:  (1) a "maritime lien for unpaid seamens' wages against MISS CONY [in the amount of $22,500 plus interest] which has priority against all other persons to the proceeds of the vessel as security for his wages, plus interest"; and (2) a "maritime lien for necessaries against MISS CONY in the amount of approximately $18,500, plus interest."  Intervenor

Complaint ¶ 15, 18.  Keene prays for:  (1) a declaration that his maritime lien for seamens' wages is valid and "superior to the interest, maritime and non-maritime liens or claims and any and all other persons, firms or corporations"; (2) the condemnation and sale of the vessel to pay Keene's demands; (3) a declaration that "all persons, firms or corporations claiming any interest in [the vessel] are forever barred and foreclosed of and from outright or equity of redemption or claim of, in or to the liened vessel and every part thereof"; and (4) an award against Defendants, jointly and severally, for Keene's demands, attorneys' fees, and costs.  Intervenor Complaint Prayer for Relief.

IV.    ANALYSIS.

     A.   The Court Compels Arbitration of Amegy's <u>In Personam</u> Claims, Stays Court Action on Amegy's Claims, and Denies Amegy's Motion for <u>Interlocutory Sale</u>.

Defendants argue that the arbitration agreement constitutes an "explicit and unequivocal agreement between the parties to arbitrate their disputes."  Motion to Compel at 9.  They contend that, because Amegy's claims in the Complaint are entirely based on agreements requiring arbitration, all of Amegy's claims must be arbitrated.  Motion to Compel at 9.  Defendants also argue that Amegy's claims in this court must be stayed pending arbitration.  Motion to Compel at 10; Reply at 8-11.

10

Amegy does not challenge the validity of the arbitration agreement. Rather, Amegy argues that "arbitration is not required" because Defendants "have not identified any dispute, claim or controversies" and "Defendants cannot, in good faith, claim any legitimate dispute regarding the monies owed." Amegy Opp. at 2-3, 5. Amegy alternatively argues, "Even if arbitration is required, . . . there is no basis for staying this lawsuit" because "the Change Agreements clearly allow [Amegy] to pursue its in rem action against the vessel without interference from an arbitrator or the Court." Amegy Opp. at 6. Because the court concludes that Amegy's in personam claims, as well as Defendants' challenge to its request for interlocutory sale, should be decided by the arbitrator, the court compels arbitration of Amegy's in personam claims, denies Amegy's motion for interlocutory sale, and stays court action on Amegy's claims.

The arbitration agreement provides that the FAA "shall apply to the construction, interpretation, and enforcement of this arbitration provision." Exs. E-F at 2. "The FAA provides that any arbitration agreement within its scope 'shall be valid, irrevocable, and enforceable,' and permits a party 'aggrieved by the alleged refusal of another to arbitrate' to petition any federal district court for an order compelling arbitration in the manner provided for in the agreement." Chiron Corp., 207 F.3d at 1130 (internal citations omitted). A district court's role under

11

the FAA is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." Id. "If the response is affirmative to both counts, then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." Id. The Ninth Circuit recognizes that valid arbitration agreements "shall be 'rigorously enforced.'" Republic of Nicaragua v. Standard Fruit Co., 937 F.2d 469, 475 (9th Cir. 1991).

In the present case, the parties do not dispute that the arbitration agreement is a valid agreement to arbitrate. Therefore, this court is limited to "deciding only whether the dispute is arbitrable, that is, whether it falls within the scope of the parties' agreement to arbitrate." See Chiron Corp., 207 F.3d at 1131 ("Because the parties do not challenge the validity of the Agreement, the FAA restricts our review to deciding only whether the dispute is arbitrable, that is, whether it falls within the scope of the parties' agreement to arbitrate.").

It is well established that "[f]ederal substantive law governs the question of arbitrability." Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 719 (9th Cir. 1999). "The standard for demonstrating arbitrability is not high. The Supreme Court has held that the FAA leaves no place for the exercise of discretion by a district court, but instead mandates that district courts

12

direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Id. "To require arbitration, [the movant's] factual allegations need only 'touch matters' covered by the contract containing the arbitration clause." Id. at 721 (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 624 n.13 (1985)).

"Questions of arbitration must be addressed with a healthy regard for the federal policy favoring arbitration." Quackenbush v. Allstate Ins. Co., 121 F.3d 1372, 1380 (9th Cir. 1997). "[A]ny doubt concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is construction of the contract language itself or the allegation of waiver, delay, or a like defense to arbitrability." Wosely, Ltd. v. Foodmaker, Inc., 144 F.3d 1205, 1209 (9th Cir. 1998). Arbitration agreements are interpreted "by applying general state-law principles of contract interpretation." Wagner v. Stratton Oakmont Inc., 83 F.3d 1046, 1049 (9th Cir. 1996); cf. Mediterranean Enters., Inc. v. Ssangyong Corp., 708 F.2d 1458, 1463 (9th Cir. 1983) ("the issue of arbitrability 'is to be determined by the contract entered into by the parties'"). In the present case, the court looks to Texas state law to interpret the arbitration agreement. See Exs. E-F ("This Agreement will be governed by, construed and enforced in accordance with federal law and the laws of the State of Texas.").

Under Texas law, a court's "primary concern in interpreting a contract is ascertaining the true intent of the parties." Zurich Am. Ins. Co. v. Hunt Petroleum (AEC), Inc., 157 S.W.3d 462, 465 (Tex. Ct. App. 2004). Courts "examine the writing as a whole in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless" and "give terms their plain, ordinary, and generally accepted meaning unless the contract shows the parties used them in a technical or different sense." Id. "If the contract can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and the court will construe it as a matter of law." Id.

The arbitration agreement provides that "all disputes" between Amegy, as the lender, and IMIC, as the borrower, "shall be arbitrated." However, the agreement leaves no doubt that the arbitrator may not "enjoin or restrain any act of any party" and, notwithstanding a pending arbitration between Amegy and IMIC, that either party would remain free to seek "equitable relief from a court."

In determining whether Amegy's claims are arbitrable, the court need determine only that Amegy's factual allegations "touch matters" covered by the Promissory Notes, Change Agreements, and Mortgage. See Simula, Inc., 175 F.3d at 721. As Amegy's claims are expressly based on the Promissory Notes,

14

Change Agreements, and Mortgage, Amegy's claims more than "touch matters" covered by those contracts.  See Simula, Inc., 175 F.3d at 721.

The only wrinkle in this analysis is the existence of Amegy's in rem claims.  In Amegy's motion for an interlocutory sale of the vessel, Amegy is relying on federal jurisdiction over in rem claims concerning a vessel that, pursuant to an arrest authorized by this court, is in the hands of an approved custodian.  As the vessel itself was not a party to the arbitration agreement, this court declines to order arbitration of the in rem claims.  However, if allowed to proceed ahead of the arbitration of the in personam claims, the in rem claims would render the arbitration a nullity.  To preserve the parties' agreement to arbitrate the in personam claims, this court denies the motion for interlocutory sale and stays the in rem claims.

The request to sell is left for the arbitrator to address in the context of the in personam claims.  While the arbitration agreement provides that taking or disposing of collateral is not prohibited by the agreement, any dispute "concerning the lawfulness or reasonableness of any act . . . concerning any Collateral . . . shall . . . be arbitrated."  These provisions mean that, although a party may be free to dispose of collateral if there is no objection, any challenge to

15

the lawfulness or reasonableness of such disposal is subject to arbitration.

Defendants do object to the interlocutory sale requested by Amegy. Amegy argues that arbitration is unnecessary because Defendants "have not identified any dispute, claim or controversies" and "do not have any legitimate dispute." Amegy Opp. at 2-3. The court disagrees. Defendants clearly contest Amegy's claims. See Reply at 4 ("Defendants have given explicit notice that they dispute [Amegy's] claims."); Declaration of Richard R. Foreman (9/13/2006) ¶ 6 ("IMIC contests the claims brought against it by [Amegy]."); see generally Opp. to Motion for Interlocutory Sale. At the very least, Defendants are challenging the reasonableness of the proposed sale, and the arbitration agreement requires arbitration of disputes "concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral." Under the plain language of the agreement, the parties' dispute about whether an interlocutory sale is lawful or reasonable is for the arbitrator to decide. Should Defendants seek to enjoin any sale of the vessel that the arbitrator orders, they must move this court, not the arbitrator, for such injunctive relief. As a practical matter, of course, no sale can proceed without action by this court, given the federal control of the vessel. The

16

court therefore envisions further court proceedings to enforce any sale the arbitrator may order.

Amegy complains that "the Change Agreements grant [Amegy] the unfettered right to take and dispose of the vessel . . . without interference from an arbitrator or the Court." Amegy Opp. at 5-6. If Amegy had possession of the vessel, the agreement would not prohibit Amegy from selling it. However, it was Amegy that had the vessel arrested, taking the vessel out of the parties' control. Amegy thus gave up any "unfettered" right.

The court compels arbitration of Amegy's in personam claims, stays court action on Amegy's claims, and denies Amegy's motion for interlocutory sale without prejudice.

B. The Court Declines to Stay Keene's In Rem Claim.

Defendants ask this court to stay Keene's in rem claim (but not his in personam claims) against the vessel "in the interest of economy and efficiency because it is necessarily intertwined with [Amegy's] action." Motion to Compel at 10. While conceding that none of Keene's claims is subject to arbitration, Defendants argue that, because Amegy's in rem claim must be stayed, "it would be inefficient and uneconomical (and procedurally confusing, at a minimum) to allow [Keene] to prosecute a parallel action in rem while [Amegy's] action in rem is stayed." Motion to Compel at 10-11. Keene contends that "it would be unfair to impose a stay of the instant proceeding on

17

Keene which might prevent him from promptly pursuing his claims." Keene Opp. at 2-3. The court declines to stay any of Keene's claims.

Although a court must stay actions involving arbitrable claims pending the outcome of arbitration, a district court has the discretion to decide whether to stay litigation among nonarbitrating parties pending arbitration. See Moses H. Cone Mem'l Hosp., 460 U.S. at 21 n.23 ("In some cases, of course, it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration. That decision is one left to the district court . . . as a matter of its discretion to control its docket."); see also Gray v. Conseco, Inc., 2000 WL 1480273, at *8 (C.D. Cal 2000) ("The district court's power is the same whether the non-arbitrable claims arise between parties with other arbitrable claims or instead are brought by parties with no arbitrable claims."). "A district court's inherent, discretionary power to control its proceedings should promote economy of time and effort for itself, for counsel, and for litigants." Roderick, 2004 WL 2554453, at *3. A "stay of all issues, and as to all parties, is warranted when questions of fact common to all would be involved in both the litigation and the arbitration." Bischoff v. Directv, Inc., 180 F. Supp. 2d 1097, 1114 (C.D. Cal. 2002); see also United States

v. Neumann Caribbean Int'l, Ltd., 750 F.2d 1422, 1427 (9th Cir. 1985).

Keene's claim against the vessel is based on Foreman's alleged failure to pay Keene seaman wages and expenses. Keene's action is not related to the Promissory Notes, Change Agreements, or Mortgage that are the basis of Amegy's in rem claim against the vessel and in personam claims against Defendants. The only matters Keene has in common with Amegy are the assertion of a lien on the vessel and the request to sell it. Although the court and the arbitrator may both be presented with whether an interlocutory sale of the vessel is proper, that determination would be based on the facts underlying the separate complaints. Contrary to Defendants' assertion, Keene's and Amegy's actions are not so intertwined that a stay on Keene's in rem claim is required. Moreover, a stay of only Keene's in rem claim, but not his in personam claims, may prove to be less efficient and economical than to allow Keene's entire action to proceed. In its discretion, the court declines to stay any of Keene's claims. See Moses H. Cone Mem'l Hosp., 460 U.S. at 21 n.23.

Keene joined in Amegy's motion for interlocutory sale, which the court denies on the ground that it presents an arbitrable dispute and must therefore be arbitrated. Keene's joinder did not flesh out fully the independent grounds on which a sale should be ordered in the absence of a motion by Amegy.

19

Keene's request is therefore denied, without prejudice to Keene's filing of an independent motion more fully supporting Keene's position.

At the hearing on this matter, Defendants suggested that they might pay money into the court in lieu of a bond covering Keene's claims.  Should Defendants thereby earn the release of the vessel with respect to Keene's claims, the court will address the new stance of the case with the parties.

V.     CONCLUSION.

The court compels arbitration of Amegy's in personam claims and stays court action on Amegy's claims.  The court denies without prejudice Amegy's motion for interlocutory sale, as well as Keene's joinder in that motion.  The court also denies Defendants' request to stay Keene's in rem claim.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, September 27, 2006.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

**Amegy Bank National Association fka Southwest Bank of Texas, N.A. v. Miss Cony, Cayman Island O.N. 733932, her engines, tackle, gear and appurtenances, in rem, et al.**, Civ. No. 06-00405 SOM/KSC; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY ACTION; ORDER DENYING AMEGY BANK NATIONAL ASSOCIATION'S MOTION FOR INTERLOCUTORY SALE.